1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NORTH DAKOTA
2                    EASTERN DIVISION

3                                   Case No. 3:22-cr-010

4
      United States of America,          )
5                                        )
                            Plaintiff,   )
6                                        )
                  vs.                    )
7                                        )
      Macalla Lee Knott,                 )
8                                        )
      _____ Defendant. )
9

10

11             T R A N S C R I P T

12                      OF

13          P R O C E E D I N G S

14                 (Sentencing)

15

16
                    Taken at:
17         Quentin N. Burdick U.S. Courthouse
                655 First Avenue North
18            Fargo, North Dakota 58102

19
                  January 3, 2025
20                   9:07 a.m.

21

22

23

24    BEFORE THE HONORABLE PETER D. WELTE

25    COURT REPORTER:  CAROLYN TAYLOR PEKAS, RPR

```
1                    A P P E A R A N C E S

2     COUNSEL FOR THE PLAINTIFF:

3     Christopher C. Myers, Esq.
          Assistant United States Attorney
4         655 First Avenue North, Suite 250
          Fargo, North Dakota 58102-4932
5         701.297.7400
          chris.c.myers@usdoj.gov
6

7     COUNSEL FOR THE DEFENDANT:

8     Tanya M. Martinez, Esq.
          MARTINEZ LAW, PLLC
9         3332 Fourth Avenue South, Suite 2B
          Fargo, North Dakota 58103
10        701.491.7646
          tanya@johnsonmartinezlaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (The above-entitled matter came before
 2       the Court, the Honorable Peter D. Welte, United
 3       States District Court Chief Judge, presiding,
 4       commencing at approximately 9:07 a.m., Friday,
 5       January 3, 2025, at the Quentin N. Burdick U.S.
 6       Courthouse, 655 First Avenue North, Fargo, North
 7       Dakota.)
 8               THE COURT:  We're on the record, and the
 9       matter before the Court is the United States
10       vs. Macalla Knott.
11               Ms. Knott is present.  Good morning,
12       Ms. Knott.
13               THE DEFENDANT:  Good morning.
14               THE COURT:  She's represented by Tanya
15       Martinez, and the United States is represented by
16       Chris Myers.
17               We are here for a sentencing hearing.
18               And I will note for the record that Dyan
19       Jorgenson is present by interactive video from
20       the Ron Davies Courthouse and Federal Building in
21       Grand Forks, North Dakota.
22               Ms. Knott, before we proceed, let's have
23       you placed under oath.  Would you please stand
24       and raise your right hand?
25               THE DEFENDANT:  Yes.
```

```
 1                    - - - - -
 2                MACALLA KNOTT,
 3     having been duly sworn, testified as follows:
 4                    - - - - -
 5          THE COURT:  Thank you.  Be seated,
 6     please.
 7          Ms. Knott, how are you doing this
 8     morning?
 9          THE DEFENDANT:  I'm pretty good.  I'm
10     pretty good.  How are you?
11          THE COURT:  Well, thank you.  I am well.
12     I am much more concerned with you, to make sure
13     that you're doing okay and that your -- your
14     mental state is good?
15          THE DEFENDANT:  Yes.
16          THE COURT:  Okay.  You're not under the
17     influence of any alcohol or drugs, are you?
18          THE DEFENDANT:  No.
19          THE COURT:  Okay.  I have to ask that
20     question, as silly as it may seem, but we just
21     want to make sure that you're sober.
22          I know that you came over here from
23     Becker County, so the marshals probably were
24     transporting you quite early this morning.
25          THE DEFENDANT:  Yes.
```

```
 1              THE COURT:  Okay.  Did you get some
 2    sleep last night?
 3              THE DEFENDANT:  Barely, but yes.
 4              THE COURT:  All right.  Did you get
 5    enough sleep so that your head is fresh and
 6    you're ready to move forward?
 7              THE DEFENDANT:  Yes.  I've been waiting
 8    for this day forever.  Yes.
 9              THE COURT:  Okay.  Are you satisfied
10    with the legal representation you've received in
11    this case?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Okay.  Very good.  Well,
14    then we will move forward.
15              I do have a Presentence Investigation
16    Report, and I note that with regards to that
17    Presentence Investigation Report, which was filed
18    less than a week ago as Document 650 in the
19    record, that there are no unresolved objections
20    to the PSIR.
21              Is that the case, Ms. Martinez?
22              MS. MARTINEZ:  Yes, Your Honor.
23              THE COURT:  Thank you.
24              And, Mr. Myers, the same?
25              MR. MYERS:  That's correct, Your Honor.
```

1          THE COURT:  Okay.  Let's talk about the

2     offense level computation in this document.  The

3     offense level computation is set forth in the

4     PSIR, and that starts on page 9.  Paragraph 24

5     sets forth the base offense level at a 42.  The

6     adjusted offense level is also a 42.

7          I will note in paragraph 27 that

8     although Ms. Knott had an aggravating role in the

9     conspiracy pursuant to Comment Note 1 and 2D1.5,

10     an adjustment from Chapter Three should not be

11     applied because it's already incorporated into

12     the count of conviction.

13          Ms. Martinez, no questions about that?

14          MS. MARTINEZ:  No, Your Honor.

15          THE COURT:  Okay.  So the adjusted

16     offense level is a 42, and the Defendant is

17     afforded a two-level reduction for accepting

18     responsibility and an additional one level for

19     timely notification.  Total offense level of 39.

20          Ms. Knott has 14 criminal history

21     points, so she's Criminal History Category VI, so

22     the sentencing guideline range in this matter is

23     life.

24          Any objection to the computation of the

25     Court, Ms. Martinez?

```
 1              MS. MARTINEZ:  No, Your Honor.
 2              THE COURT:  And Mr. Myers?
 3              MR. MYERS:  No objection, Your Honor.
 4         I would note that I think the defense
 5    was asking for an adjustment in the criminal
 6    history category, based on oral representation,
 7    because I think -- I think it's pretty clear that
 8    the driving under suspension after revocations
 9    have -- have driven her criminal history score
10    and category way high, so -- we discussed this
11    beforehand.  I don't have an objection.  I think
12    legally the Court can move it one category down,
13    from a VI to a V, is how I understand the law to
14    be, but I just wanted to make sure that was in
15    the record.  We did discuss that, and it makes
16    sense here.
17              We also talked to Ms. Jorgenson about
18    that, and I think Probation is in agreement with
19    that, if I'm not mistaken, so...
20              THE COURT:  Yeah.  I appreciate you
21    bringing that up.  Let's first make sure that
22    there are no objections to the computation the
23    Court has.
24              That's the case, Mr. Myers?
25              MR. MYERS:  No objection, Your Honor.
```

```
1              THE COURT:  Thank you, sir.

2              Ms. Martinez, your voice is a little

3    softer to me, in my ears, so if we can get that

4    microphone somehow arranged so it's more directly

5    in front of you.

6              Now, the criminal history -- the

7    argument, I believe, that's being made is that

8    the criminal history is overrepresented because

9    10 of her 13 criminal history points are due to

10   driving after revocation convictions.

11             Ms. Martinez, do you wish to spell out

12   the argument more?  I know that you've documented

13   it as well.  Go ahead.

14             MS. MARTINEZ:  Your Honor, I think that

15   what I put in my memo explains it.  I don't

16   think -- I am aware that the Court thoroughly

17   reviews the memos and all of the attachments.  It

18   was my hope that the Court would take a look at

19   those priors and do as Mr. Myers has suggested,

20   reduce the category.  I would ask that it would

21   be reduced a couple of levels, because the points

22   were all DUSs, to Category III.

23             THE COURT:  Well, this is a request for

24   a departure due to an overrepresentation of the

25   criminal history category and the --
```

```
1                 Ms. Jorgenson, can you please delineate
2        for me the specific guideline for the departure?
3                 USPO JORGENSON:  Under 4A1.3(b)(1).
4                 THE COURT:  4A1.3 -- was that "b," as in
5        "boy," 1?
6                 USPO JORGENSON:  Yes.
7                 THE COURT:  And -- all right.
8                 So, Mr. Myers, do you care to speak to
9        the request any more than you already have?
10                MR. MYERS:  No, Your Honor.  Thank you.
11                THE COURT:  Thank you.
12                Under (b)(1):  If reliable information
13       indicates that the defendant's criminal history
14       category substantially overrepresents the
15       seriousness of the defendant's criminal history
16       or the likelihood that the defendant will commit
17       other crimes, a downward departure may be
18       warranted.
19                And a limitation on the extent of the
20       downward departure for a career offender is set
21       forth in 4A1.3(b)(3).  That does not apply here.
22                In this specific instance, it's pretty
23       clear that the driving after revocations -- as a
24       matter of fact, if all of the driving after
25       revocations were removed, Ms. Knott would be a
```

1    Criminal History Category II instead of a VI.

2    She was incarcerated when she signed petitions to

3    plead in these cases, and she accepted 90-day

4    sentences.

5         I do think, given the heavy impact on

6    her criminal history category, that a downward

7    departure under 4A1.3(b)(1) is warranted.

8         Now, there must be written

9    specifications.  It does say:  In departing from

10   the otherwise applicable criminal history

11   category under this policy statement, the Court

12   shall specify in writing the specific reasons why

13   the applicable criminal history category

14   substantially overrepresents the seriousness of

15   the criminal history or the likelihood that the

16   defendant will commit other crimes.

17        So the Court will do that in the

18   departure section under -- in the Statement of

19   Reasons of the judgment, but I think the parties

20   are in agreement that it does apply.  It will be

21   reduced one category, which will bring us to a 39

22   and a Criminal History Category V, which means

23   that the guideline range is --

24        Is it then still 360 to life,

25   Ms. Jorgenson?

1          USPO JORGENSON:  Yes, Your Honor.

2          THE COURT:  Okay.  Ms. Martinez, any

3   objection to the computation of the Court?

4          MS. MARTINEZ:  Only to the extent that

5   we would ask that it be reduced down to a

6   Category III, which is one category higher than

7   what it would be if the Court completely

8   disregarded them.

9          Ms. Knott pled to those because she

10  wanted programming in prison; and so, you know,

11  if she had been reinstated, the normal practice

12  is to dismiss them.  It's just she wanted

13  programming, so she just pled to everything to

14  clear that up and get programming in prison.

15         THE COURT:  Mr. Myers, response of the

16  United States to that?

17         MR. MYERS:  Yeah.  Two things, Judge.  I

18  think the Court is legally bound to reduce it

19  only by one category, as I recall; but, in any

20  event, in this case the guideline is life because

21  of the minimum mandatory on the CCE count, so

22  it's a distinction without a difference.

23         THE COURT:  Yeah.  With regards to

24  Count Five, it's not actually 360 to life.  The

25  guideline is life on Count Five, and -- and to

1    say it's a distinction without a difference is

2    accurate.

3            The request for further departure is

4    denied.  The Court can make the finding and will

5    reduce it to writing in the Statement of Reasons

6    with regards to the overrepresentation based on

7    the driving after revocations, but the Court is

8    limited under federal law to one category, and so

9    we will follow the limits.

10            Any further objections to the PSIR?

11            MS. MARTINEZ:  No, Your Honor.

12            THE COURT:  Okay.  So -- I shouldn't say

13    "further objections" because there actually are

14    no unresolved objections.  Correct?

15            MS. MARTINEZ:  Correct.

16            THE COURT:  And, Mr. Myers, the same?

17            MR. MYERS:  Correct, Your Honor.

18            THE COURT:  All right.  So we have a

19    PSIR, then, and the Court will accept the

20    undisputed portions of the PSIR as findings of

21    fact for purposes of this hearing today, and the

22    Court does that pursuant to the Federal Rules of

23    Criminal Procedure.

24            It occurs to me that the Court has

25    something that it needs to address with the

```
 1    parties in camera, so as inconvenient as it is
 2    going to be for the full gallery here,
 3    Mr. Birrenkott and Mr. Porter, the court security
 4    officers, are going to assist all who are not
 5    part of the legal teams of either side out of the
 6    courtroom.  When I get back on the record --
 7    you'll be invited in before I go back on the
 8    record, so you will miss nothing that is on the
 9    record, but I have something that I need to
10    address with the parties in camera.
11            So, ladies and gentlemen, if you're not
12    part of the legal teams, please exit.
13            (The observers were cleared from the
14    courtroom and the following in camera proceedings
15    were held:)
16
17
18
19
20
21
22
23
24
25
```















21

















19          (In camera proceedings concluded.)

20          THE COURT:  Okay.  We are out of in

21   camera.  We're back on the record.

22          Prior to going in camera, the Court

23   accepted the undisputed portions of the

24   Presentence Investigation Report as findings of

25   fact for purposes of this hearing, and we are

```
1        ready now for the recommendations of the parties.
2               As is the standard, the United States
3        will give their recommendation first, and then
4        the defense will give theirs.  Ms. Knott will
5        have an allocution, if she so desires, and the
6        Court will then impose sentence.
7               Mr. Myers.
8               MR. MYERS:  Thank you, Your Honor.
9               And I think the defense would -- there's
10       a couple people that want to speak on Ms. Knott's
11       behalf, too, just so the Court is aware, but I'll
12       be brief, Judge.
13              THE COURT:  Okay.
14              MR. MYERS:  I just want to cover a few
15       areas in this particular case in support of our
16       recommendation, and we're going to ask the Court
17       to sentence Ms. Knott on Counts Four and Five,
18       and as the Court is aware, Count One is a lesser
19       included of the Continuing Criminal Enterprise
20       charge.
21              And so in this particular case, Judge,
22       we're going to recommend to the Court a sentence
23       of 321 months with supervised release of five
24       years.
25              I just want to talk about -- a little
```

1    bit about some of the arguments advanced related

2    to the 3553(a) factors, recognizing the (a)

3    factors are not applicable here, but I just want

4    to briefly cover a response to those.

5        And Ms. Martinez did a nice job of

6    putting together the sentencing memorandum in

7    this particular case.  And recognizing that

8    Ms. Knott has had a difficult childhood, to say

9    the least, that is, I think, undisputed here

10    and -- and not unlike most every case we see in

11    federal court with families.  What is different

12    here, and it goes to an aggravating factor in

13    this particular case, is she was able to navigate

14    those family circumstances and ultimately was,

15    you know, supplying her grandma with pound

16    quantities of methamphetamine and supervising her

17    father to store drugs and money and facilitate

18    money being moved to Mexico.

19        And so as it relates to an aggravating

20    factor, Ms. Knott has -- is charming and has the

21    ability to manipulate people to serve her

22    purposes -- very nice, very likeable -- but it is

23    a -- it is a natural skill that she possesses,

24    and there's almost an air of immaturity when she

25    presents.  And I don't know if that's a facade or

1    her personality, but it -- but it endears people

2    to her, and she has this unique ability to get

3    people to do what she wants them to do, and it

4    is, in a true sense, an illusion as to her role

5    in this organization.

6            When you look at some of the aggravating

7    factors of the nature and circumstances of the

8    offense, you look at the amount of people

9    Ms. Knott supervised in this organization, nearly

10   twice that that is required to prove the

11   continuing criminal enterprise.  I think we

12   allege nine.  It's probably more than nine in

13   this particular conspiracy.

14           And what's remarkable, Judge, is she did

15   it from a foreign country, which is no easy task.

16   Just navigating the trafficking activities and

17   ensuring that large shipments of drugs are into

18   the United States and that money is being paid;

19   the ability to influence and manipulate people to

20   ensure that the drugs arrive and the money is

21   paid is remarkable.

22           And Ms. Knott did it for two years in

23   Mexico, and she did it knowing before she went to

24   Mexico and -- and there's an argument advanced

25   that she went down to Mexico for COVID, and maybe

1    that's part of the reason; there are probably a

2    number of reasons, but it's undisputed that

3    Ms. Knott was a large-scale drug trafficker

4    before she went to Mexico.  She knew the folks,

5    at least some of the folks, in Mexico and went

6    down there and just became bigger from Mexico.

7    And that is remarkable, and it takes a unique

8    skill set that, in our view, is an aggravating

9    factor.

10            And then it goes without saying the

11   large quantities and shipments of drugs that were

12   shipped into the Midwest, just huge quantities

13   as -- as the Court is well aware and as alleged

14   in the Indictment.

15            And so those aggravating factors, in our

16   view, far outweigh the mitigating factors cited

17   by the defense in this particular case to the

18   extent they even apply.

19            And so at the end of the day, Judge, we

20   believe a sentence that is appropriate, given all

21   of the circumstances, is 320 months -- 321 months

22   and five years supervised release.

23            I think as part of the agreement we've

24   moved to dismiss Counts Two and Eight in this

25   particular case.

```
 1              And so I think that is all I have at
 2     this time.  Thank you.
 3              THE COURT:  Thank you, Mr. Myers.
 4              Ms. Martinez.
 5              MS. MARTINEZ:  Your Honor, this was my
 6     first CCE case, so it's been with me for about
 7     two and a half years now, and that's no secret.
 8     My client's aware of that.  I've learned a lot
 9     through this case.
10              One thing that I have done is spent
11     many, many hours with my client and had many
12     conversations.  If it's a facade, it's -- it's
13     one that's been kept up unbelievably well,
14     because Macalla is always Macalla when I
15     encounter her.
16              Mr. Myers is correct.  She is very
17     endearing.  The first thing she was worried about
18     this morning when she saw me is how am I doing.
19     She said, "You're going to do a good job."  She's
20     always worried about what's going on in somebody
21     else's life, and I think that that did contribute
22     to her ability to survive in Mexico.  It's just
23     very hard to be angry with her, and she doesn't
24     stay angry with people.
25              I agree that there would be an element
```

1     of immaturity there, almost naivete, in that she

2     truly wants to believe the best of people, and so

3     she looked at the people in Mexico like that,

4     looked at them as being poverty stricken, and you

5     know, that's one of the things that they did to

6     get themselves out of poverty.

7              But once actually after being there,

8     things, I would suggest, did not necessarily get

9     bigger for her.  The Mexican cartel had her, and

10    they used her and used her charm and used her

11    capacity to see that good in people.

12             She befriended the women that were in

13    the family, and some of them spoke English, so

14    they were of great assistance to her.

15             And she was able to navigate her way

16    through Mexico, but she's kind of a novelty.

17    She's an American, blonde-haired, blue-eyed gal

18    who is very pretty and very charming, and that

19    did probably allow her to pass through very

20    difficult situations with some ease.

21             The coordination that occurred with the

22    people back here wasn't so much rocket science or

23    anything special particular to her case.  Once

24    Frankie and Miguel were involved, all of a sudden

25    the quantities became much higher, her fear

1    became much greater, and she didn't -- the way

2    Ms. Knott would describe it is she didn't fare

3    nearly as well as she did during the earlier drug

4    trafficking, prior to going to Mexico.

5         The profits weren't necessarily going to

6    her.  She was getting money from unemployment

7    that attributes for $3,000 a month for two years,

8    so that's approximately, what, $70,000 that would

9    have been transferred?  She guesstimates that she

10   made approximately $45,000 in profits during the

11   time that she was in Mexico.  But we don't

12   dispute that the operation didn't get bigger;

13   it's just that it eclipsed her, and she became

14   just a pawn in it.  And as indicated earlier, I

15   truly believe that if the United States

16   Government had not rescued her, she would be dead

17   today.

18         (Private discussion between the

19   Defendant and Ms. Martinez.)

20         MS. MARTINEZ:  Her mother, Tanja

21   Tilleskjor, would like to give a statement, and

22   also a friend, Ashley Schlichting, if the Court

23   would so allow.

24         I think that in the memorandum I've

25   intertwined what many, many character letters

```
 1    have said, but those two are important to her and
 2    highlight, and they would like to address the
 3    Court personally.
 4              THE COURT:  Thank you, Mr. Porter.
 5              Yes.  You may approach the bar, ma'am,
 6    and you may come past and come to the podium.
 7              Please say your name and spell the name
 8    for the record.
 9              TANJA TILLESKJOR:  My name is -- is it
10    on?
11              THE COURT:  I don't think so.
12              Now it is.
13              TANJA TILLESKJOR:  Hello.  My name is
14    Tanja Tilleskjor, T-I-L-L-E-S-K-J-O-R.  I am
15    Kayla's mother.
16              I guess I'm not sure where to start, but
17    let me rebut what Mr. Myers said.  He's got my
18    daughter completely wrong.  She's a beautiful
19    soul.  She'll do anything for anybody, and that's
20    part of the problem.  She doesn't know how to say
21    no to people.  She'll help anyone.  You hurt her,
22    she'll still help you.  That's just who she is.
23              It's not an act, sir.  It's her.  She's
24    a beautiful person.  People want to be around her
25    because of who she is.  She makes you feel better
```

1    just being in her presence.

2           She did not go down there to continue no

3    empire.  She went down there to get away from

4    COVID.  She went down there with, knowing she had

5    a way back through, a passport, which later

6    didn't happen for her, so she then became stuck.

7    She was stuck down there.  She had no way to get

8    back.  She tried getting other passports sent to

9    her.  They didn't make it through the mail.  I

10   guess the Mexican mail is pretty corrupt.

11          I had to borrow her money down there to

12   pay rent, so if she was continuing her empire, I

13   wouldn't have needed to do that.

14          THE COURT:  You'll need to face the

15   front of the court.

16          TANJA TILLESKJOR:  I'm just -- you guys

17   have it wrong.  She wasn't up here doing that and

18   then going down there to continue anything.  She

19   ended up getting stuck there.  She had no other

20   means.  She had no other way.  She had no way to

21   make money to survive.  She knew -- she did what

22   she knew how to do, and we've got to believe that

23   is because of me, my mother.  It's a long history

24   that's finally ended.

25          She doesn't deserve 300-and-some months.

```
 1    I swear to God, she doesn't.  She wasn't
 2    manipulating anyone.  She has no money.  She has
 3    no car.  She has nothing.  I mean, I would think
 4    a kingpin would have all kinds of things to
 5    confiscate.  She had nothing.  She's not who
 6    they're making her out to be.
 7              And I beg you, I beg you not to give her
 8    that much time.  Thank you.
 9              THE COURT:  Thank you.
10              Please come forward.  Thank you.
11              Please proceed with your name, and then
12    if you'd spell it for the record, please.
13              ASHLEY SCHLICHTING:  Yes.  My name is
14    Ashley Schlichting, and that's
15    S-C-H-L-I-C-H-T-I-N-G.
16              THE COURT:  Thank you.  Please proceed.
17              ASHLEY SCHLICHTING:  You're welcome.
18              So I've known Kayla since I was about
19    12 years old, so it's been over 20 years.  Sorry.
20    I'm going to get emotional.
21              So I met her -- I wrote this in the
22    letter.  Sorry.
23              Thank you.
24              THE COURT:  Thank you, Marshal.
25              ASHLEY SCHLICHTING:  But I met her
```

 1    biking, and we would bike up to this grocery

 2    store -- I mean this convenience store near home,

 3    near our home, and Kayla would be hanging out

 4    with her little brother, and she would beg us to

 5    go biking because she wanted some friends to hang

 6    out with, and so that's how I met Kayla.  And

 7    she -- like, she meshed and immersed into my

 8    family.

 9          And who you guys know -- like, I

10    respect, like, all of your guys' positions

11    because you were placed there for a reason, but

12    who you hear Kayla to be and the -- the bad way

13    that you're drawing it out, that's just who she's

14    been.

15          She was craving a family.  She was

16    living with her grandma.  She would come over to

17    my family's house to celebrate holidays, to have

18    dinner, to spend time and actually experience a

19    family.  I grew up in a very loving home.  My

20    parents loved everybody, and they love Kayla to

21    this day.  It breaks their heart that she ended

22    up here.

23          And she's always been supportive, and

24    that's just who she is.  She's ingrained to love

25    on you, and it's not a facade.  It seems like

```
1    immaturity, but she just loves life.
2           No matter what happens to her today -- I
3    know that people have to face consequences for
4    their actions, but I've been working in the
5    recovery community for several years now, and
6    it's people like Kayla that I keep pushing
7    forward because they're good people.  They grew
8    up in a messed-up situation.  She didn't have a
9    normal family to go to and do these things.  It's
10   how she was raised.  And it's nothing against her
11   family.  I love her parents to death because
12   they -- they made this wonderful person, but
13   it's -- it's -- in our recovery community, we
14   have to show love to these people.
15          I was in -- stuck in addiction myself,
16   and I'm very fortunate and blessed to be able to
17   go inside the prisons today and help people like
18   her so that they can transform their life and use
19   what they've been putting for bad to good.
20          You know, I -- I -- I strongly rely on
21   my faith.  I 100 percent believe that we can be
22   transformed and use what we've been doing in our
23   addiction and use it for good.  And I just -- I
24   pray that you see that because the judge that
25   gave me a break when I had dealt with my stuff
```

1    saw and had hope in me that I didn't have for

2    myself, and it wasn't until years later that I

3    can thank him for allowing me to live my life for

4    my children, for my family.

5           Kayla's a wonderful person, and if we

6    can put what she does to use in our community

7    and -- and give her that support -- because

8    that's all she's every known.  If we can give her

9    the resources and tools to be who she needs to

10   be, the -- the people that are getting stuck in

11   these systems and coming out are not the same

12   people.  It's like we -- we have to be conformed,

13   and then you get institutionalized, and it's so

14   hard to break out of it.

15          And I just ask that you see who she is

16   as a person, and it's not a bad thing.  She will

17   make you laugh.  She annoys the heck out of my

18   dad, like -- my dad will never crack -- he'll

19   never crack a joke, he'll never laugh; and Kayla

20   can sit in our living room with him, and we're

21   laughing.

22          And, like, she would call us from

23   Mexico, and my parents -- it would break their

24   heart because they knew that she was stuck.  And

25   you could hear it in her voice.  And she missed

1    her family, and she missed home, and she missed

2    us because she just loves us.  Like, she loves

3    everybody, honestly.  She probably loves the

4    prosecutor right now.  It's just an unconditional

5    love.  Like, she's not going to hold anything

6    against anybody, and I don't think that's a

7    fault.  I think what Kayla has and possesses,

8    yes, she used it for not so good things, but

9    she's a wonderful person.

10          And we can -- we can benefit in our

11    community from people like her.  I just ask that

12    you consider that when you're making this

13    decision because, like I said, it's -- it's a lot

14    of time, and then for her to not be able to live

15    a life -- and I understand the people and stuff

16    that she's affected, and I'm not -- I'm not

17    trying to override that at all.  I'm just saying

18    she is a person.

19          I am no one special.  Half the people

20    that are in recovery in these -- in these pews

21    are nobody special.  We just were able to find a

22    way out because we had people to support us, and

23    we had that drive to go in the right direction.

24          And I'm telling you, what Kayla went

25    through, nobody deserves to go through.  And what

```
1     she went through is something that will forever
2     change her life, and I know that she will use
3     what she's learned for the good.
4            But I just want to thank you, sir, for
5     all this, and I want to thank each and every
6     single one of you.
7            And I love you, Kayla.
8            THE COURT:  Thank you.
9            Ms. Martinez, is your client ready to
10    allocute to the Court?
11           (Private discussion between the
12    Defendant and Ms. Martinez.)
13           MS. MARTINEZ:  Yes, Your Honor.
14           THE COURT:  Thank you.
15           Ms. Knott?
16           THE DEFENDANT:  Yes.
17           THE COURT:  Go ahead.  What's on your
18    mind today?
19           MS. MARTINEZ:  Your Honor, I expected
20    that you would ask her questions.
21           THE COURT:  I'm just not hearing you.
22    You've got to get the mic in there.
23           MS. MARTINEZ:  I apologize, Your Honor.
24    I thought you were going to ask her questions as
25    part of the allocution.
```

1          THE COURT:  Sure.  My question simply

2     is:  Would you like to make a statement to the

3     Court, and if you would, what would you like to

4     say?

5          THE DEFENDANT:  No, I -- I wrote you a

6     letter.

7          THE COURT:  Yeah.

8          THE DEFENDANT:  And I just -- I don't

9     know what to say.

10          THE COURT:  It's a well-written letter.

11          THE DEFENDANT:  Thank you.

12          THE COURT:  You know, do you have

13     anything further that you'd like to add before I

14     proceed?

15          THE DEFENDANT:  No.

16          THE COURT:  Time doesn't permit the

17     Court to specifically address all of the

18     statements made by your character witnesses and

19     by the character letters or -- and most

20     importantly by your letter, but I do -- I would

21     be remiss if I didn't explain and frame the

22     issues that are before the Court today.

23          You know, there was a statement by

24     Ashley, your second character witness to testify

25     this morning here, to make a statement, about

1    hearts being broken, and that's evident.  This is

2    a heartbreaking case, and it's -- it is a sad,

3    sad case.

4              Now, in court, if you're in court at the

5    state level, state court judges have discretion

6    that federal court judges don't have.  They have

7    a level of discretion that they can exercise, and

8    sometimes at the state court level how people

9    feel about you or what you've done to impact

10   their lives is something that can be taken into

11   consideration.  Now, to some extent, it can be

12   taken into consideration in federal court, too,

13   but in federal court, the judges have much less

14   discretion, the Court has much less discretion,

15   and the sentence that is imposed is to be a

16   sentence that is sufficient but not greater than

17   necessary, and that's under the Guidelines and

18   under Federal Code.

19             There's a political commentator that's

20   out there that has coined the phrase "facts don't

21   care about your feelings."  I'm not saying that's

22   the case in this courtroom, but I am saying that

23   the facts of what you have done matter a lot more

24   when fashioning that sentence, in considering the

25   statutory factors, and that's why we have

```
 1    Sentencing Guidelines, which are advisory
 2    guidelines.
 3             So heartbreaking case, yeah, but also
 4    another word that is important here, another
 5    phrase that's important, is that this is a
 6    heartland case.  Under the Sentencing Guidelines,
 7    this is a case that is right in the heartland of
 8    what is contemplated by United States Code and by
 9    the Guidelines.
10             And Ms. Tilleskjor, law enforcement and
11    Mr. Myers have a role here, and if -- when we go
12    to trial, I often speak to the jurors about what
13    the role of everybody is in this matter.  The
14    role of the defense attorney, for example, is set
15    forth for the jury, and the defense attorney's
16    job is to zealously represent and defend their
17    client within the confines of the law.
18             And prosecutors and law enforcement have
19    a role as well, and that's to prosecute the case
20    within the confines of the law.
21             Go ahead, Ms. Knott.  If you need to
22    speak to Ms. Martinez, I can hold my thought.
23             THE DEFENDANT:  No.  Sorry.
24             THE COURT:  Are you sure?
25             THE DEFENDANT:  Yeah.
```

```
1                    THE COURT:  Okay.  If at any time during
2        this hearing you need a moment with your lawyer,
3        you just let me know.  Okay?
4                    THE DEFENDANT:  Okay.  Thank you.
5                    THE COURT:  Thank you.
6                    If we have a jury trial, the jurors have
7        a role, and their role is the finders of fact,
8        and the Court is the finder of law.  Everybody
9        has their roles.
10                   You know, law enforcement and Mr. Myers
11       don't need anybody to defend them or their
12       actions in these cases, but I do want to assure
13       you, Ms. Tilleskjor, that Mr. Myers would much
14       rather not be here today, he would rather be
15       doing something else on January 3rd, and that
16       these law enforcement officers would much rather
17       not have -- not be here, but they poured their
18       guts into this.
19                   You know, law enforcement sometimes
20       is -- is described as intrepid, you know,
21       adventurous, but oftentimes that intrepid nature,
22       that courageous nature evolves into something
23       more, which is a -- which is heroism, and there
24       was a whole lot of heroism going on in this case
25       by law enforcement in this matter.  A lot.  A lot
```

1    that's not seen, a lot that's not even known by

2    the Court this morning.

3          You know, for those of you who have

4    training in economics, there's such a thing as

5    opportunity cost.  Right?  The idea is that

6    there's opportunity cost; that's the loss of

7    potential gain because of choices that are made

8    for other alternatives.  There's a big

9    opportunity cost here.

10          We have -- Ms. Knott, you are -- you

11    have some education and college.  Correct?

12          THE DEFENDANT:  Yes.  Yes.

13          THE COURT  You are educated; you're

14    charismatic; you're persuasive, likeable,

15    articulate.  All of these lend to the

16    heartbreaking nature of this particular matter.

17    Bright, articulate people like you that are

18    recently 32 years old --

19          THE DEFENDANT:  Yes.

20          THE COURT:  -- are -- you know, you're

21    supposed to be doing other things with your life,

22    lives.  In this case, I suspect, speaking of

23    opportunity cost, that there were probably other

24    lives that were affected or lost that are unknown

25    to law enforcement because of this particular

1    continuing criminal enterprise, and in the

2    federal system, that needs to be accounted for

3    and is accounted for.

4          Ms. Knott, you're the first person that

5    I've seen in my time both as a practicing

6    attorney and as a federal judge that I'm willing

7    to admit might be a little bit of a victim of

8    life.  This whole file here that I have -- this

9    is half of what I have on my bench.  Much of it

10   is your biography, right, your life story.  Both

11   parents involved in drug trafficking; your

12   grandma involved in drug trafficking; you working

13   closely with the cartel; your life arguably,

14   maybe not even arguably, saved by the heroic

15   actions of law enforcement.

16         You know, I always try to tell my kids,

17   don't be a victim of life.  You had a life story

18   that -- to say that it is sad and tragic is a

19   great understatement, but there's also part of

20   this that is your autobiography.  The difference

21   between a biography and an autobiography is that

22   the autobiography is the story of your life

23   written by you, and you wrote some of this story,

24   and that's what you're being sentenced on today

25   is the continuing criminal enterprise that is

1      that part.

2              Now, you're going to be sitting a

3      stretch of time, and you're going to need to do

4      some work on yourself, but by my math, when

5      you're released from federal prison, you'll still

6      be in your very early 50s.  You'll have a lot of

7      life left because you're very young now.  And --

8      and so my hope and desire is that you are able to

9      turn it around and -- and that is what will be

10     the work that is left to you.

11             Having said that, Ms. Knott, I have

12     considered the entire file in this matter, and I

13     have considered the statements of Counsel, your

14     statement, all the letters in the file, your

15     written letter, the character statements made

16     today.  I've considered the Sentencing

17     Guidelines.  I've considered the Sentencing

18     Factors under 18 U.S. Code 3553(a), and I've

19     considered all of the statutory and guideline

20     factors in the filing at Document 653.  I'm

21     granting the motion of the United States at

22     Document 653 in imposing sentence today.

23             And pursuant to the Sentencing Reform

24     Act of 1984, it's the judgment of this Court that

25     you shall be committed to the custody of the

1    Bureau of Prisons on Count Five for 321 months;

2    on Count Four for 240 months, concurrent.

3         The Court is not imposing sentence on

4    Count One.  The Court is not to impose sentence

5    on Count One because it's a lesser included

6    offense of Count Five, so no sentence is

7    pronounced on Count One.

8         On Count Four you will be subject to

9    supervised release for the statutory maximum of

10   three years, and on Count Five you'll be on

11   supervised release for ten years.

12        The statute provides that there should

13   be at least five years of supervised release.

14   Ms. Jorgenson, is that a limit of five years max

15   as well?

16        USPO JORGENSON:  It is not, Your Honor.

17   It's a minimum of five years.

18        THE COURT:  Yeah.  So the Court is

19   imposing ten.

20        And, Ms. Knott, the Court also is

21   imposing the $100 special assessment on

22   Count Four and Count Five for $200 total, and

23   that must be paid immediately.

24        Now, with regards to your supervised

25   release, you're going to be subject to mandatory

1    conditions of supervised release and standard

2    conditions of supervised release.

3              You're also going to be subject to the

4    special conditions of supervised release that are

5    delineated on page 26 and 27 of your PSIR as

6    Attachment A.  There are seven special

7    conditions.

8              Ms. Martinez, I would read all of the

9    conditions of supervised release specifically if

10   you ask me to.  If you waive reading of the

11   mandatory and standard and special conditions, I

12   would accept that waiver.

13             MS. MARTINEZ:  Your Honor, we would

14   waive it.

15             THE COURT:  All right.

16             Mr. Myers, is that to the satisfaction

17   of the United States?

18             MR. MYERS:  Yes, Your Honor.  Thank you.

19             THE COURT:  Thank you.

20             The recommendation of the Court is that

21   you assess for and participate in RDAP at the

22   Bureau of Prisons.  That would be greatly to your

23   benefit with regards to the decisions that you

24   make in the future and your cognitive structure

25   and paradigm through which you see life.  It will

1    help you a lot, Ms. Knott.

2            The Court dismisses the forfeiture

3    allegation upon motion of the United States.

4            Is that correct, Mr. Myers?

5            MR. MYERS:  Yes, Your Honor.  I think we

6    filed that previously.

7            THE COURT:  Yeah.  And the Court

8    dismisses Count Two and Count Eight as well.

9            Additionally, with the motion at

10   Document 653, the Court grants that motion and

11   withdraws the certified prior conviction that was

12   set forth as well, and that was pursuant to the

13   Plea Agreement.

14           As indicated, the Court finds that this

15   is a case that is in the heartland of what is

16   contemplated by Federal Code and by the

17   Guidelines.

18           Ms. Knott, you have two weeks to appeal

19   this.  I know that you remember from your change

20   of plea, even though that was a long time ago,

21   that you have -- that you have an appeal waiver

22   in your Plea Agreement, which is common in all

23   plea agreements in federal court.  You reserve

24   the right to appeal in two limited instances, and

25   Ms. Martinez is an experienced attorney who can

1    advise you on that.

2            Mr. Myers, is there anything further on

3    behalf of the United States?

4            MR. MYERS:  No, Your Honor.  Thank you.

5            THE COURT:  Ms. Martinez?  Take a moment

6    with your client, please.

7            (Private discussion between the

8    Defendant and Ms. Martinez.)

9            MS. MARTINEZ:  Your Honor, with the

10   imposition of RDAP, would she also be entitled to

11   the reduction in credits?

12           THE COURT:  That is something that you

13   are going to need to research.  I can't answer

14   that.  I can tell you that after the hearing

15   perhaps Ms. Jorgenson, or if there's any other

16   probation officers around, they can maybe advise.

17   It's a -- it's a question that the Court is not

18   comfortable answering.

19           MS. MARTINEZ:  Thank you.

20           THE COURT:  Thank you.

21           Ms. Martinez, do you have anything

22   further?

23           MS. MARTINEZ:  I think, Your Honor, if I

24   heard this correctly, you went with exactly what

25   the United States Government was requesting, that

1    321 months?

2              THE COURT:  Yes.

3              MS. MARTINEZ:  Nothing further to add

4    other than I would just ask that you reconsider

5    and shave off maybe a few years, which is likely

6    what would have occurred had we come to an

7    agreement, but Ms. Knott really wanted you to

8    have all of this information and to put it in

9    front of you.  We needed this type of sentencing

10   hearing.  And that would have been 23 years,

11   which isn't much different, but it's something.

12             THE COURT:  The Court has considered all

13   of the factors set forth in the Guidelines, and

14   the sentence that was imposed is, in the Court's

15   estimation, sufficient but not greater than

16   necessary.

17             MS. MARTINEZ:  Thank you, Your Honor.

18             THE COURT:  Thank you.

19             Ms. Knott, God bless you, and good luck

20   to you in your future.

21             THE DEFENDANT:  Thank you.

22             THE COURT:  We are in recess.

23             (These proceedings were concluded at

24   10:16 a.m.)

25

```
 1                CERTIFICATE OF COURT REPORTER

 2

 3         I, Carolyn Taylor Pekas, a duly appointed

 4    Registered Professional Reporter, DO HEREBY

 5    CERTIFY:

 6         That the proceedings were reported in

 7    stenotype by me at the aforementioned time and

 8    place;

 9         That the foregoing fifty-five (55)

10    typewritten pages contain a true and correct

11    transcript of the proceedings to the best of my

12    ability.

13         WITNESS my hand and seal this 3rd day of

14    February, 2025.

15

16

17

18

19

20       /s/ Carolyn Taylor Pekas

21    _____

22    Carolyn Taylor Pekas, RPR
      United States District Court Reporter
23    District of North Dakota
      Eastern Division
24

25
```